1

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)

2

1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024

3

Telephone: (310) 405-7190

4

jpafiti@pomlaw.com

5

*Attorney for Plaintiff*

6

*[Additional Counsel on Signature Page]*

7

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9

10

JASON WOOD, Individually and on Behalf of
All Others Similarly Situated,

11

12

Plaintiff,

13

v.

14

WELLS FARGO & COMPANY, C. ALLEN
PARKER, TIMOTHY J. SLOAN and JOHN R.
SHREWSBERRY,

15

16

17

Defendants.

18

Case No:

CLASS ACTION

COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Jason Wood ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by Wells Fargo & Company ("Wells Fargo" or the "Company"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all those who purchased or otherwise acquired Wells Fargo securities between October 13, 2017 and October 13, 2020, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Wells Fargo and certain of the Company's current and former senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      Wells Fargo is a global financial services company headquartered in San Francisco, California.  The Company provides banking, investment and mortgage products and services, as well as other consumer and commercial financial services.  It is one of the largest banks in the world as measured by both market capitalization and total assets.

3.      Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Wells Fargo had systematically failed to follow appropriate underwriting standards and due diligence guidelines in issuing billions of dollars' worth of commercial loans, including by inflating the net income and future

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

expected cash flows of its commercial clients to justify issuing excessive loan amounts; (ii) a materially higher proportion of Wells Fargo's commercial loan customers were of poor credit quality and/or at a substantially higher risk of default than disclosed to investors; (iii) Wells Fargo had failed to timely write down commercial loans, collateralized loan obligations ("CLOs") and commercial mortgage backed securities ("CMBS") on its books that had suffered impairments; (iv) Wells Fargo had materially understated the reserves needed for expected credit losses in its commercial portfolios; (v) Wells Fargo had systematically misrepresented the credit quality and likelihood of default of the loans it packaged and securitized into CLOs and CMBS, including by artificially inflating the net income and expected cash flows of its commercial clients in loan and securitization documentation; (vi) the CLO and CMBS-related loans issued and investment securities held by Wells Fargo were of lower credit quality and worth far less than represented to investors; (vii) as a result of (i)-(vi) above, Wells Fargo's Class Period statements regarding the credit quality of its commercial loans, its underwriting and due diligence practices, and the value of its CLO and CMBS books were materially false and misleading; and (viii) as a result of all the foregoing, Wells Fargo was exposed to severe undisclosed risks of financial, reputational and legal harm, in particular in the event of significant and sustained stress in the commercial credit markets.

4.    On April 14, 2020, Wells Fargo issued a press release providing its results for the first quarter of 2020. The release revealed a stunning deterioration in the Company's credit portfolio, particularly with respect to its commercial loans.

5.    On this news, Wells Fargo's stock price fell 14% over the following three trading sessions, closing at $26.89 per share on April 16, 2020.

6.    Then, on May 5, 2020, Wells Fargo filed its quarterly report for the first quarter with the SEC, which stated that the fair value of the Company's CLO investments held-for-sale had fallen to $26.9 billion by the quarter's end, a 9% decline from the end of the quarter and year ended December

31, 2019 ("FY19"), and that Wells Fargo had suffered $1.7 billion in unrealized losses on its CLO investments during the quarter.

7.    On this news, Wells Fargo's stock price fell another 6% over two trading days to close at $25.61 per share on May 6, 2020.

8.    Then, on June 10, 2020, Wells Fargo's Chief Financial Officer ("CFO") John Shrewsberry ("Shrewsberry") presented at the Morgan Stanley Virtual US Financials Conference. During the conference, Shrewsberry revealed that Wells Fargo's second quarter reserve build would be even "bigger than the first quarter" as a result of continued deterioration in the Company's credit portfolio.

9.    On this news, Wells Fargo's stock price fell 18% over two trading days to close at $26.79 per share on June 11, 2020.

10.    On July 14, 2020, Wells Fargo issued a release providing its results for the second quarter of 2020. The release stated that Wells Fargo had suffered a $2.4 billion loss during the quarter, or ($0.66) per share, largely as a result of deterioration in its commercial credit portfolio.

11.    On this news, Wells Fargo's stock price fell another 5% to close at $24.25 per share on July 14, 2020.

12.    Finally, on October 14, 2020, Wells Fargo issued a release providing its results for the third quarter of 2020. The release stated that Wells Fargo had recognized another provision expense of $769 million and that non-accrual loans had increased $2.5 billion, or 45%, to $8 billion during the quarter.

13.    On this news, Wells Fargo's stock price fell another 6% to close at $23.25 per share on October 14, 2020.

14.    As a result of defendants' wrongful acts and omissions, and the decline in the price of Wells Fargo common shares detailed herein, Plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.    Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. Defendant Wells Fargo maintains its corporate headquarters in this District.

17.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

18.    Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased or otherwise acquired Wells Fargo securities during the Class Period and has been damaged thereby.

19.    Defendant Wells Fargo is a financial services and bank holding company headquartered in San Francisco, California. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

20.     Defendant C. Allen Parker ("Parker") served as Interim Chief Executive Officer ("CEO") of Wells Fargo from March 2019 to October 2019, until the position was taken over on a permanent basis by Charles W. Scharf ("Scharf").   Defendant Parker previously served as the Company's General Counsel, a position to which he returned in October 2019 following the appointment of Scharf as CEO.  Defendant Parker left Wells Fargo in March 2020.

21.     Defendant Timothy J. Sloan ("Sloan") served as CEO of Wells Fargo from October 2016 until his resignation in March 2019.  He was also formerly a director of the Company.

22.     Defendant Shrewsberry served as the CFO and a Senior Vice President of Wells Fargo throughout the Class Period.  Wells Fargo announced the retirement of defendant Shrewsberry in July 2020.

23.     Defendants Parker, Sloan, and Shrewsberry are referred to herein as the "Individual Defendants."   During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Wells Fargo's operations, business practices and finances, and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Wells Fargo's financial and business operations, including the Company's commercial debt activities.   They were also intimately involved in deciding which disclosures would be made by the Company.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Wells Fargo is a global financial services company headquartered in San Francisco, California.  The Company provides banking, investment and mortgage products and services, as well as other consumer and commercial financial services.  It is one of the largest banks in the world as measured by both market capitalization and total assets.

25.     At the start of the Class Period, Wells Fargo had three operating segments: (i) Community Banking; (ii) Wholesale Banking; and (iii) Wealth and Investment Management.   The Community Banking segment included products and services for individuals and small businesses, such as checking and savings accounts, credit and debit cards, home mortgages, and student and auto loans. The Wholesale Banking segment included products and services for businesses with annual sales in excess of $5 million.   These business offerings included traditional commercial loans and lines of credit, letters of credit, asset-based lending, commercial real estate, trade financing, treasury management, and investment banking services.   The Wealth and Investment Management segment provided personalized wealth management and retirement products and services.   For fiscal 2019, Wholesale Banking was responsible for $10.7 billion in net income, or 55% of the Company's total consolidated net income, making it Wells Fargo's most profitable operating segment.

26.     In February 2020, Wells Fargo announced that Community Banking would be split into two new operating segments: (i) Consumer and Small Business Banking (responsible for branch banking); and (ii) Consumer Lending (responsible for consumer loans).   Similarly, the Company announced that Wholesale Banking would be split into two new operating segments: (i) Commercial Banking (responsible for commercial lending and government and institutional banking); and (ii) Corporate & Investment Banking (responsible for capital markets, investment banking and the Company's commercial real estate portfolio).   Although this transition is still ongoing, the reporting structure maintains the general divide between Wells Fargo's consumer products and services on the one hand and its commercial lending and capital market activities on the other.

27.     Beginning in mid-2007, the bursting of the U.S. housing bubble caused the values of securities tied to U.S. real estate to plummet and precipitated an international banking crisis.   The events culminated in the Global Financial Crisis and Great Recession, one of the greatest wealth-

destruction events in modern history, which wiped out trillions of dollars of wealth in the U.S. and around the world.

28.     A primary cause of the Global Financial Crisis and Great Recession was excessive risk taking by major banks and financial institutions.  In particular, these market participants fueled the significant growth of the subprime mortgage market and the increase in housing speculation that preceded the Global Financial Crisis and Great Recession by issuing and underwriting home mortgages to borrowers that posed a high risk of default.  These low-quality home loans were then securitized and packaged into residential mortgage backed securities ("RMBS") which were in turn marketed and sold to investors.  In RMBS, home mortgages serve as collateral, and investors receive fixed interest payments according to their particular investment tranche as mortgage borrowers pay off these mortgages over time.  Higher tranches earn less interest, but are ostensibly at a low default risk because any losses are first absorbed by lower tranches, which earn higher interest.  In the lead up to the Global Financial Crisis and Great Recession, bundles of RMBS were then further securitized as collateralized debt obligations ("CDOs") and marketed and sold to investors in tranches in a similar fashion to the underlying RMBS.

29.     The diversification of the collateral underlying RMBS and CDOs purportedly minimized the risks these investments posed to investors.  As these securities were made up of hundreds or even thousands of underlying mortgages, RMBS and CDOs were marketed as safe investments because, purportedly, it would be highly unlikely that a substantial number of the mortgages would default at the same time.  Tranches in RMBS and CDOs built with subprime and low quality mortgages at a substantial risk of default were given the highest credit ratings because of the protections purportedly provided by this diversification, and billions of dollars' worth of these ostensibly safe RMBS and CDOs were sold to investors.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30.     As the wreckage wrought by the Global Financial Crisis and Great Recession ultimately revealed, however, RMBS and CDOs were far more risky than disclosed to investors – indeed, they posed an existential threat to the entire financial system.  A root cause of this latent, undisclosed risk was the fact that these products were built on a subprime mortgage market rife with fraud, abuse and excessive risk taking.  Financial institutions and other mortgage market participants systematically lent to borrowers who did not have the means to repay the loans, violated basic due diligence standards, and focused on growing mortgage balances at all costs and without regard to the attendant risks because of the short-term fees and profits that could be generated.  This systematic breakdown in applicable underwriting standards, risk controls and due diligence practices flooded the market with defective mortgage loans that risked default in the face of any significant market stress.

31.     Furthermore, the myriad roles in the residential mortgage market played by large financial institutions and the growth in mortgage securitizations created significant correlation risk within these institutions and throughout the financial system, exacerbating the potential ill-effects of any drop in home prices or rise in mortgage defaults.  The big banks and their affiliates not only played central roles in the origination of subprime loans, but also in their securitization and the proliferation of these securitized products throughout the capital markets as issuers, servicers, market makers and investors.  Moreover, the fact that various RMBS and CDOs often referenced the same home loans meant that a default in one such loan was likely to compound consequences to a variety of financial products.  Thus, far from being truly diversified, RMBS and CDOs in fact concentrated and exacerbated risks and increased collateral damage from the defects described above in the subprime mortgage market.

32.     Wells Fargo played a central role in activities that led to the Global Financial Crisis and Great Recession.  The Company has paid billions of dollars in fines, penalties and restitution to regulatory authorities for its abuses in the subprime mortgage market.  For example, in August 2018,

Wells Fargo agreed to pay $2.1 billion to the federal government after the U.S. Department of Justice ("DOJ") found that the Company had originated and sold residential mortgage loans that it knew contained misstated income information and did not meet the quality that Wells Fargo had represented. Wells Fargo packaged these defective loans into RMBS that subsequently suffered billions of dollars in losses. Notwithstanding the culpability of Wells Fargo and its subsidiaries in precipitating the Global Financial Crisis and Great Recession, Wells Fargo was rewarded with a $25 billion tax-payer funded bailout to prevent its collapse, although investors in the Company nevertheless suffered billions of dollars in losses.

33.    At the time of the 2018 DOJ settlement, Wells Fargo emphasized that it had reformed its lending practices and was committed to providing sustainable loans to facilitate economic growth. Defendant Sloan, for example, stated: "We are pleased to put behind us these legacy issues regarding claims related to residential mortgage-backed securities activities that occurred more than a decade ago." He continued: "Wells Fargo remains focused on our important role as one of the nation's leading providers of mortgage financing and on our commitment to expanding sustainable homeownership opportunities for our customers." Indeed, both leading up to and during the Class Period, defendants made Wells Fargo's purported commitment to strong underwriting guidelines, effective due diligence practices and the high quality of the Company's credit portfolios points of emphasis in their discussions with investors.

34.    Unbeknownst to investors, however, despite these assurances, Wells Fargo was in fact engaged in many of the same types of abuses, control deficiencies, excessive risk taking and lax underwriting practices that had helped precipitate the Global Financial Crisis and Great Recession and caused such egregious harm to Wells Fargo investors. This time, however, the hidden threat did not derive from the Company's consumer lending or residential mortgage products and services, but rather from its commercial credit portfolios.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

35. Since 2009, Wells Fargo has dramatically ramped up its commercial lending activities, increasing the size of its commercial loan portfolio by hundreds of billions of dollars. Between December 31, 2009 and December 31, 2019, Wells Fargo's commercial loan balance increased by more than $200 billion, or 68%. Much of this growth was fueled by Wells Fargo's efforts to lend to businesses that posed a heightened risk of default. Wells Fargo systematically concealed these credit risks by, *inter alia*, artificially inflating the incomes generated by borrowing businesses in loan and securitization documentation, relaxing or failing to follow proper underwriting procedures, and circumventing applicable risk controls.

36. Making matters worse, Wells Fargo bundled these defective loans into securitized financial products that it then packaged and sold to investors, becoming a leading participant, market maker and investor in the fast-growing collateralized commercial debt markets. Wells Fargo specialized in two such products in particular: CLOS and CMBS. Much like RMBS, CLOs and CMBS are fixed-income securities sold to investors in tranches that reference underlying debt. The difference lies in the collateral. Whereas RMBS consist of bundled home mortgages, CLOs consist of packaged commercial loans to businesses and CMBS reference mortgages for commercial real estate. Just as it did in the lead-up to the Global Financial Crisis and Great Recession in the subprime lending space, Wells Fargo and its most senior executives have knowingly concentrated and exacerbated the risks posed by the defective commercial loans Wells Fargo originated through the securitization and wide-ranging distribution of such loans, posing a severe risk of financial harm to the Company's investors in the event of significant and sustained stress in commercial credit markets.

37. Rather than disclose the true facts regarding Wells Fargo's commercial lending practices during the Class Period, defendants concealed the Company's actual business practices and misrepresented the attendant risks to investors.

## Materially False and Misleading Statements Issued During the Class Period

38.     The Class Period begins on October 13, 2017.  On that date, Wells Fargo issued a release providing its results for the quarter ended September 30, 2017 ("3Q17").  The Company stated that it had generated $4.6 billion in net income during the quarter on $21.9 billion of revenue.  The release emphasized Wells Fargo's purportedly "solid credit quality."  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $500.2 billion, "reflecting paydowns and continued underwriting discipline," and that the Company had only $113 million in net charge-offs in its commercial portfolio during the quarter, or just 0.09% of the average loan balance.  The release stated that Wells Fargo's allowance for credit losses ("ACL") stood at $12.1 billion by quarter end, or 1.27% of total loans.  The release quoted Wells Fargo's Chief Risk Officer as stating that "[c]redit results remained strong in the third quarter . . . . The loan portfolio continued to perform well, led by . . . continued solid performance in the commercial portfolio."

39.     On November 3, 2017, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 3Q17, which was certified as to its accuracy by defendants Sloan and Shrewsberry.  The 3Q17 Form 10-Q included the financial and operational results contained in the 3Q17 earnings release.  The 3Q17 Form 10-Q stated that "[s]olid credit quality continued in third quarter 2017, as our net charge-off rate remained low at 0.30% (annualized) of average total loans."  The 3Q17 Form 10-Q stated that Wells Fargo held $35.3 billion in CLOs for sale and an additional $660 million in CLOs held-to-maturity as of September 30, 2017.

40.     The 3Q17 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in third quarter 2017 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $717 million, or 0.30% (annualized) of average loans, in third quarter 2017, compared with $805 million a year ago (0.33%). The decrease in net charge-offs in third

11

quarter 2017, compared with a year ago, was driven by lower losses in the commercial and industrial loan portfolio, including in the oil and gas portfolio. Our total oil and gas loan exposure, which includes unfunded commitments and loans outstanding, was down 8% from a year ago.

Our commercial portfolio net charge-offs were $113 million, or 9 basis points of average commercial loans, in third quarter 2017, compared with net charge-offs of $215 million, or 17 basis points, a year ago . . . . Our commercial real estate portfolios were in a net recovery position for the 19th consecutive quarter, reflecting our conservative risk discipline and improved market conditions . . . .

The allowance for credit losses as of September 30, 2017, decreased $585 million compared with a year ago and decreased $431 million from December 31, 2016. The allowance for credit losses at September 30, 2017 included $450 million for coverage of our preliminary estimate of potential hurricane-related losses from Hurricanes Harvey, Irma and Maria. The allowance coverage for total loans was 1.27% at September 30, 2017, compared with 1.32% a year ago and 1.30% at December 31, 2016. The allowance covered 4.3 times annualized third quarter net charge-offs, compared with 4.0 times a year ago. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $717 million in third quarter 2017, down from $805 million a year ago, primarily reflecting improvement in the oil and gas portfolio.

Nonperforming assets decreased $512 million, or 5%, from June 30, 2017, the sixth consecutive quarter of decreases, with improvement across our consumer and commercial portfolios and lower foreclosed assets. Nonperforming assets were only 0.98% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $437 million from the prior quarter primarily due to a $276 million decrease in commercial nonaccruals. In addition, foreclosed assets were down $75 million from the prior quarter.

41.     On January 12, 2018, Wells Fargo issued a release providing its results for the quarter and year ended December 31, 2017 ("FY17"). The Company stated that it had generated $6.2 billion in net income during the fourth quarter on $22.1 billion of revenue. In the release, defendant Sloan was quoted as stating: "The progress we made over the past year was evident in the fourth quarter in . . . loan growth particularly in commercial loans . . . ." The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $503.4 billion and that the Company had only $115 million in net charge-offs in its commercial portfolio during the quarter, or just 0.09%of the average loan balance. The release stated that Wells Fargo's ACL stood at $12.0 billion by quarter end, or 1.25% of total loans.

42.     Also on January 12, 2018, Wells Fargo held an earnings call with analysts and investors to discuss its FY17 financial results led by defendants Sloan and Shrewsberry.  During their prepared remarks, defendant Sloan highlighted Wells Fargo's "historically low credit losses," while defendant Shrewsberry emphasized Wells Fargo's "continued credit discipline in a very competitive market" in reference to the Company's commercial real estate loan portfolio.  Defendant Shrewsberry later stated: "Our credit quality remained exceptionally strong.  Our loss rate for the full year was among the lowest in our history, and in the fourth quarter, our loss rate was 31 basis points of average loans."

43.     In response to an analyst's question, defendant Sloan represented that Wells Fargo was issuing commercial real estate loans of the highest credit quality and responsibly growing revenues through the Company's real estate capital markets business, stating in pertinent part as follows:

> I mean, we're the largest commercial real estate lender by far, and not only in total but in almost every product type. And we have the most diverse and broadest commercial real estate platform in the market. We are committed to this business long term. But to be committed to the real estate business long term, you need to also make important and disciplined decisions when you see that you're at a period in the cycle that doesn't last forever but a period in the cycle where I think that credit – underwriting standards or pricing might be a little bit out of balance. I mean, that's how you get to stay in this business through cycles because you make good decisions. So we want to grow this book, but we want to grow it in a way that is – makes the right decision for our shareholders. So what we've seen this year is an increase in competition, slightly lower in credit spreads – or standards, excuse me, and a little bit more aggressive pricing, and that's meant that our book has declined a little bit. But again, we've got a balanced business here, and so our real estate capital markets business has absolutely been on fire, and you can see that in other parts of the – of revenues in the company. So I wouldn't look at this as we're kind of purposely rolling down this book because we don't like the business. We love the business. We want to grow it. We want to grow it so that we are ready for next year and the next cycle.

44.     On March 1, 2018, Wells Fargo filed with the SEC its annual report on Form 10-K for FY17, which was signed by defendants Sloan and Shrewsberry, who also certified its accuracy.  The FY17 Form 10-K incorporated the Company's 2017 Annual Report and included the financial and operational results contained in the FY17 earnings release.  The FY17 Form 10-K stated that "[c]redit quality improved in 2017, as our net charge-off rate remained low at 0.31% of average total loans."

The FY17 Form 10-K also stated that Wells Fargo held $35.7 billion in CLOs for sale and an additional $661 million in CLOs held-to-maturity as of December 31, 2017.

45.    The FY17 Form 10-K contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Credit quality remained solid in 2017, driven by continued strong performance in the commercial and consumer real estate portfolios. Performance in several of our commercial and consumer loan portfolios remained near historically low loss levels and reflected our long-term risk focus. Net charge-offs of $2.9 billion were 0.31% of average loans, compared with $3.5 billion and 0.37%, respectively, from a year ago. Net losses in our commercial portfolio were $446 million, or 9 basis points of average loans, in 2017, compared with $1.1 billion, or 22 basis points, in 2016. Our commercial real estate portfolios were in a net recovery position for each quarter of the last five years, reflecting our conservative risk discipline and improved market conditions.

* * *

The allowance for credit losses of $12.0 billion at December 31, 2017, was down $580 million compared with the prior year. Our provision for credit losses in 2017 was $2.5 billion compared with $3.8 billion a year ago reflecting a release of $400 million in the allowance for credit losses, compared with a build of $250 million in 2016. The build in 2016 was primarily due to deterioration in the oil and gas portfolio, while the release in 2017 was due to strong underlying credit performance.

Nonperforming assets (NPAs) at the end of 2017 were down $2.7 billion, or 24%, from the end of 2016. Nonaccrual loans declined $2.3 billion from the prior year end while foreclosed assets were down $336 million from 2016.

46.    On April 13, 2018, Wells Fargo issued a release providing its results for the quarter ended March 31, 2018 ("1Q18").  The Company stated it had generated $5.9 billion in net income during the quarter on $21.9 billion of revenue.  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $503.4 billion and that the Company had only $78 million in net charge-offs in its commercial portfolio during the quarter, or just 0.06% of the average loan balance.  The release stated that Wells Fargo's ACL had declined to $11.3 billion by quarter end, or 1.19% of total loans.

47.     Also on April 13, 2018, Wells Fargo held an earnings call with analysts and investors to discuss its 1Q18 financial results led by defendants Sloan and Shrewsberry.   During his prepared remarks, defendant Sloan represented that Wells Fargo's 1Q18 "results included continued strong credit performance."   Defendant Shrewsberry similarly stated: "We've also maintained our credit risk discipline for new originations in Commercial Real Estate during a period of high liquidity and increased competition, resulting in 4 consecutive quarters of lower balances."

48.     On May 4, 2018, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 1Q18, which was certified as to its accuracy by defendants Sloan and Shrewsberry.   The 1Q18 Form 10-Q included the financial and operational results contained in the 1Q18 earnings release.   The 1Q18 Form-Q stated that "[s]olid credit quality continued in first quarter 2018, as our net charge-off rate remained low at 0.32% (annualized) of average total loans."   The 1Q18 Form 10-Q stated that Wells Fargo held $36.4 billion in CLOs for sale and an additional $567 million in CLOs held-to-maturity as of March 31, 2018.

49.     The 1Q18 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in first quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $741 million, or 0.32% (annualized) of average loans, in first quarter 2018, compared with $805 million a year ago (0.34%). The decrease in net charge-offs in first quarter 2018, compared with a year ago, was driven by lower losses in the commercial and industrial loan portfolio, including in the oil and gas portfolio.

Our commercial portfolio net charge-offs were $78 million, or 6 basis points of average commercial loans, in first quarter 2018, compared with net charge-offs of $143 million, or 11 basis points, a year ago . . . . Our commercial real estate portfolios were in a net recovery position for the 21st consecutive quarter, reflecting our conservative risk discipline and improved market conditions. Net losses on our consumer real estate portfolios improved by $56 million, or 187%, to a net recovery of $26 million from a year ago, reflecting the benefit of the continued improvement in the housing market and our continued focus on originating high quality loans . . . .

The allowance for credit losses as of March 31, 2018, decreased $974 million compared with a year ago and decreased $647 million from December 31, 2017 . . . .

Nonperforming assets decreased $388 million, or 4%, from December 31, 2017, the eighth consecutive quarter of decreases, with improvement across our consumer and commercial portfolios and lower foreclosed assets. Nonperforming assets were 0.88% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $317 million from the prior quarter largely due to a decrease in commercial nonaccruals. In addition, foreclosed assets were down $71 million from the prior quarter.

50.     On July 13, 2018, Wells Fargo issued a release providing its results for the quarter ended June 30, 2018 ("2Q18"). The Company stated that it had generated $5.2 billion in net income during the quarter on $21.6 billion of revenue. The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $503.1 billion and that the Company had only $67 million in net charge-offs in its commercial portfolio during the quarter, or just 0.05% of the average loan balance. The release stated that Wells Fargo's ACL stood at $11.1 billion by quarter end, or 1.18% of total loans.

51.     Also on July 13, 2018, Wells Fargo held an earnings call with analysts and investors to discuss its 2Q18 financial results led by defendants Sloan and Shrewsberry. In his prepared remarks, defendant Sloan claimed: "We've committed to transform how we manage risk at Wells Fargo, and our goal is not only to meet, but exceed regulatory expectations so that we have the best risk management in the industry." He highlighted the Company's "credit quality" as an example of its purportedly "strong track record of managing many of our risks." Similarly, defendant Shrewsberry stated that Wells Fargo had conducted a "$150 million reserve release reflecting strong overall portfolio credit performance and lower balances" and emphasized the Company's "continued credit discipline" and "strong credit performance."

52.     On August 1, 2018, Wells Fargo issued a release discussing the Company's recent $2.1 billion settlement with the DOJ regarding its violations of law and abuses in the RMBS market leading up to the Global Financial Crisis and Great Recession. Defendant Sloan was quoted in the release as

claiming that the Company had moved beyond such illicit tactics in its credit operations, stating: "We are pleased to put behind us these legacy issues regarding claims related to residential mortgage-backed securities activities that occurred more than a decade ago." He continued: "Wells Fargo remains focused on our important role as one of the nation's leading providers of mortgage financing and on our commitment to expanding sustainable homeownership opportunities for our customers."

53.    On August 3, 2018, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 2Q18, which was certified as to its accuracy by defendants Sloan and Shrewsberry. The 2Q18 Form 10-Q included the financial and operational results contained in the 2Q18 earnings release. The 2Q18 Form-Q stated that "[s]olid credit quality continued in second quarter 2018, as our net charge-off rate remained low at 0.26% (annualized) of average total loans." The 2Q18 Form 10-Q stated that Wells Fargo held $36.4 billion in CLOs for sale and an additional $75 million in CLOs held-to-maturity as of June 30, 2018.

54.    The 2Q18 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in second quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $602 million, or 0.26% (annualized) of average loans, in second quarter 2018, compared with $655 million a year ago (0.27%). The decrease in net charge-offs in second quarter 2018, compared with a year ago, was driven by lower losses in the commercial and industrial loan and other revolving credit and installment portfolios.

Our commercial portfolio net charge-offs were $67 million, or 5 basis points of average commercial loans, in second quarter 2018, compared with net charge-offs of $75 million, or 6 basis points, a year ago . . . .

The allowance for credit losses as of June 30, 2018, decreased $1.0 billion compared with a year ago and decreased $850 million from December 31, 2017. We had a $150 million release in the allowance for credit losses in second quarter 2018, compared with a $100 million release a year ago. The allowance coverage for total loans was 1.18% at June 30, 2018, compared with 1.27% a year ago and 1.25% at December 31, 2017. The allowance covered 4.6 times annualized second quarter net charge-offs, compared with 4.6 times a year ago. Future allowance levels will be based on a variety of factors, including loan

growth, portfolio performance and general economic conditions. Our provision for loan losses was $452 million in second quarter 2018, down from $555 million a year ago, primarily reflecting an improvement in our outlook for 2017 hurricane-related losses, as well as continued improvement in residential real estate and lower loan balances.

Nonperforming assets decreased $305 million, or 4%, from March 31, 2018, the ninth consecutive quarter of decreases, with improvement in the real estate 1-4 family first mortgage portfolio and lower foreclosed assets. Nonperforming assets were 0.85% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $233 million from the prior quarter predominantly due to a decrease in real estate 1-4 family first mortgage nonaccruals. In addition, foreclosed assets were down $72 million from the prior quarter.

55.     On October 12, 2018, Wells Fargo issued a release providing its results for the quarter ended September 30, 2018 ("3Q18"). The Company stated that it had generated $6.0 billion in net income during the quarter on $21.9 billion of revenue. In the release, defendant Shrewsberry was quoted as representing that "[c]redit performance and capital levels remained strong." The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $501.9 billion and that the Company had only $152 million in net charge-offs in its commercial portfolio during the quarter, or just 0.12% of the average loan balance. The release stated that Wells Fargo's ACL stood at $11.0 billion by quarter end, or 1.16% of total loans.

56.     Also on October 12, 2018, Wells Fargo held an earnings call with analysts and investors to discuss its 3Q18 financial results led by defendants Sloan and Shrewsberry. During his prepared remarks, defendant Shrewsberry stated: "We continue to have strong credit quality." He also highlighted a "$100 million reserve release" purportedly "reflecting strong credit performance as well as lower loan balances." In particular, he emphasized the Company's "continued credit discipline in competitive and highly liquid financing" in the commercial real estate market. Later, in response to an analyst's question, defendant Sloan represented that the Company's commercial customers possessed exceptional credit quality, stating in pertinent part as follows:

I think overall and what we're seeing is that the – because of the economic growth here in the U.S., in particular, but around the world, the credit quality for our customers in commercial corporate world has never been better. They have – their balance sheets are

strong. They've extended their maturities. Their interest coverage is higher than it's ever been because their debt service is lower. So I think the fact that we've got very buoyant capital markets, very liquid capital markets and we have high credit quality for our customers means that loan growth is a little bit slower than we would have all imagined in an economic growth level that we're seeing right now.

57.    During the same call, defendant Sloan later stated: "I think overall, what you see on our balance sheet today is not only really good credit performance but a much stronger mix in terms of credit quality even if we would go into some sort of an economic downturn . . . ."

58.    On November 6, 2018, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 3Q18, which was certified as to its accuracy by defendants Sloan and Shrewsberry.  The 3Q18 Form 10-Q included the financial and operational results contained in the 3Q18 earnings release.  The 3Q18 Form-Q stated that "[s]olid credit quality continued in third quarter 2018, as our net charge-off rate remained low at 0.29% (annualized) of average total loans."  The 3Q18 Form 10-Q stated that Wells Fargo held $36.0 billion in CLOs for sale and an additional $75 million in CLOs held-to-maturity as of September 30, 2018.

59.    The 3Q18 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in third quarter 2018 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $680 million, or 0.29% (annualized) of average loans, in third quarter 2018, compared with $717 million a year ago (0.30%) . . . .

Our commercial portfolio net charge-offs were $152 million, or 12 basis points of average commercial loans, in third quarter 2018, compared with net charge-offs of $113 million, or 9 basis points, a year ago . . . .

The allowance for credit losses as of September 30, 2018, decreased $1.2 billion compared with a year ago and decreased $1.0 billion from December 31, 2017. We had a $100 million release in the allowance for credit losses in third quarter 2018, compared with no release a year ago. The allowance coverage for total loans was 1.16% at September 30, 2018, compared with 1.27% a year ago and 1.25% at December 31, 2017. The allowance covered 4.1 times annualized third quarter net charge-offs, compared with 4.3 times a year ago. Future allowance levels will be based on a variety of factors,

including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $580 million in third quarter 2018, down from $717 million a year ago, reflecting an improvement in our outlook for 2017 hurricane-related losses, as well as continued improvement in residential real estate and lower loan balances.

Nonperforming assets decreased $410 million, or 5%, from June 30, 2018, the 10th consecutive quarter of decreases, with improvement in the consumer and commercial real estate portfolios. Nonperforming assets were 0.80% of total loans, the lowest level since the merger with Wachovia in 2008. Nonaccrual loans decreased $433 million from the prior quarter primarily due to a decrease in real estate 1-4 family first mortgage nonaccruals. Foreclosed assets were up $23 million from the prior quarter.

60.     On January 15, 2019, Wells Fargo issued a release providing its results for the quarter and year ended December 31, 2018 ("FY18").  The Company stated that it had generated $6.1 billion in net income during the fourth quarter on $21.0 billion of revenue.  In the release, defendant Shrewsberry was quoted as stating: "Compared with the third quarter, we grew both loans and deposits and credit performance remained strong."  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $513.4 billion and that the Company had only $132 million in net charge-offs in its commercial portfolio during the quarter, or just 0.10% of the average loan balance. The release stated that Wells Fargo's ACL stood at $10.7 billion by quarter end, or 1.12% of total loans.

61.     Also on January 15, 2019, Wells Fargo held an earnings call with analysts and investors to discuss its FY18 financial results led by defendants Sloan and Shrewsberry.  In his prepared remarks, defendant Shrewsberry stated: "We once again had strong credit quality and high levels of liquidity and capital."  He also highlighted a "$200 million reserve release reflecting continued improvement in the credit quality of the loan portfolio."  Defendant Shrewsberry pointed to the growth in Wells Fargo's commercial loan portfolio, in particular its commercial and industrial ("C&I") loans, as an example of the Company's efforts to increase lending to "high-quality" commercial clients, stating in pertinent part as follows:

Commercial loans grew $10 billion from a year ago and $11.5 billion from the third quarter. C&I loans have grown for 5 consecutive quarters and increased $12.2 billion

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from the third quarter. This growth was broad-based across a number of our wholesale businesses and was largely to investment grade, corporate credits and high-quality middle-market borrowers.

\* \* \*

We recognize that this credit cycle has lasted longer than most, so we remain vigilant regarding credit risk. However, we continue to have strong credit results with a net charge-off rate of 30 basis points in the fourth quarter. For the fifth consecutive quarter, all of our commercial and consumer real estate loan portfolios were in a net recovery position, and nonperforming assets declined $280 million or 4% from the third quarter, and were down 16% from a year ago.

62.     Later, in response to an analyst's question, defendant Shrewsberry represented that Wells Fargo was very careful in its selection of commercial loan customers and had taken an appropriate level of risk in its CLO investments, stating in pertinent part as follows:

One is we are a participant in financing some nonbanks. This has been a topic of conversation on our calls before. And so thinking about that, we did it before the last crisis, and we've done it since. And we're very cautious about how we select customers, how we underwrite the credit that they're extending and the magnitude of the haircut that we require to protect our own advances. So we were very familiar with what's going on. We're also an investor, a CLO AAA investor, and were before the last crisis and have been today. And we think with the way loans are being originated, the way those deals are structured and our understanding and stressing of them, that, that's good risk return for Wells Fargo. With respect to the impact that it has on customers, we don't have, as customers, a lot of middle-market LBO candidates. We do have sponsors as customers and other asset managers. And as it relates to our core wholesale middle-market customer, they tend not to be a borrower of those other entities. And so I think that our, as Tim said, our willingness to stand ready to lend directly to people with whom we have a relationship, that we understand when these other sources of liquidity go away, will be something that we're probably taking advantage of in the event that we hit the end of the cycle. This was certainly true 10 years ago, and it might look similar this time.

63.     On February 27, 2019, Wells Fargo filed with the SEC its annual report on Form 10-K for FY18, which was signed by defendants Sloan and Shrewsberry, who also certified its accuracy.  The FY18 Form 10-K incorporated the Company's 2018 Annual Report and included the financial and operational results contained in the FY18 earnings release.  The FY18 Form 10-K stated that "[c]redit quality remained strong with our net charge-off rate near historic lows."  The FY18 Form 10-K also

stated that Wells Fargo held $35.6 billion in CLOs for sale and an additional $66 million in CLOs held-to-maturity as of December 31, 2018.

64.    The FY18 Form 10-K contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Credit quality remained solid in 2018, driven by continued strong performance in the commercial and consumer real estate portfolios. Performance in several of our commercial and consumer loan portfolios remained near historically low loss levels and reflected our long-term risk focus. Net charge-offs were $2.7 billion, or 0.29% of average loans, in 2018, compared with $2.9 billion, or 0.31%, in 2017.

Net losses in our commercial portfolio were $429 million, or 9 basis points of average commercial loans, in 2018, compared with $446 million, or 9 basis points, in 2017, driven by decreased losses in our commercial and industrial loan portfolio . . . .

The allowance for credit losses of $10.7 billion at December 31, 2018, declined $1.3 billion from the prior year. Our provision for credit losses in 2018 was $1.7 billion, compared with $2.5 billion in 2017, reflecting a release of $1.0 billion in the allowance for credit losses, compared with a release of $400 million in 2017. The release in 2018 and 2017 was due to strong underlying credit performance.

Nonperforming assets (NPAs) at the end of 2018 were $6.9 billion, down 16% from the end of 2017. Nonaccrual loans declined $1.2 billion from the prior year end while foreclosed assets were down $191 million from 2017.

65.    On April 12, 2019, Wells Fargo issued a release providing its results for the quarter ended March 31, 2019 ("1Q19").  The Company stated that it had generated $5.9 billion in net income during the quarter on $21.6 billion of revenue.  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $512.2 billion and that the Company had only $145 million in net charge-offs in its commercial portfolio during the quarter, or just 0.11% of the average loan balance.  The release stated that Wells Fargo's ACL stood at $10.8 billion by quarter end, or 1.14% of total loans.

66.    Also on April 12, 2019, Wells Fargo held an earnings call with analysts and investors to discuss its 1Q19 financial results led by defendants Parker and Shrewsberry.  In his prepared remarks,

defendant Parker stated that "Wells Fargo has always excelled at management of credit and market risk." Defendant Shrewsberry discussed the Company's commercial credit portfolio, stating in pertinent part as follows:

> Commercial loans declined $1.2 billion from the fourth quarter, driven by C&I loans. Recall that we had strong C&I loan growth in the fourth quarter, which included the benefits from the capital market disruption, and is expected some of those loans paid down when capital markets rebounded. This market improvement drove a $4 billion decline in Asset Backed Finance. At the same time, we had strong growth in commercial capital, reflecting seasonal strength in Commercial Distribution Finance as well as capital finance, that growth driven by a customer's origination activity and working capital needs. Our credit investment portfolio also increased as we purchased CLOs in loan form rather than as debt securities, which doesn't change the risk profile of the asset.

> Commercial real estate loans increased $460 million from the fourth quarter, the first linked-quarter increase since the first quarter of 2017. Our growth in the first quarter reflected our continued credit discipline and high-quality loan originations as well as less runoff of previously purchased loan portfolios.

67. On May 3, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 1Q19, which was certified as to its accuracy by defendants Parker and Shrewsberry. The 1Q19 Form 10-Q included the financial and operational results contained in the 1Q19 earnings release. The 1Q19 Form-Q stated that "[s]olid credit quality continued in first quarter 2019, as our net charge-off rate remained low at 0.30% (annualized) of average total loans." The 1Q19 Form 10-Q stated that Wells Fargo held $35.3 billion in CLOs for sale and an additional $60 million in CLOs held-to-maturity as of March 31, 2019.

68. The 1Q19 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in first quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $695 million, or 0.30% (annualized) of average loans, in first quarter 2019, compared with $741 million a year ago (0.32%) (annualized). The decrease in net charge-offs in first quarter 2019, compared with a year ago, was predominantly driven by lower losses in the automobile portfolio, partially offset by increases in the commercial and industrial portfolio and the credit card portfolio.

23

Our commercial portfolio net charge-offs were $145 million, or 11 basis points (annualized) of average commercial loans, in first quarter 2019, compared with net charge-offs of $78 million, or 6 basis points (annualized), a year ago . . . .

The allowance for credit losses as of March 31, 2019, decreased $492 million compared with a year ago and increased $114 million from December 31, 2018. We had a $150 million build in the allowance for credit losses in first quarter 2019, compared with a $550 million release a year ago. The allowance coverage for total loans was 1.14% at March 31, 2019, compared with 1.19% a year ago and 1.12% at December 31, 2018. The allowance covered 3.8 times annualized first quarter net charge-offs, compared with 3.8 times a year ago. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $845 million in first quarter 2019, up from $191 million a year ago. The increase was predominantly due to an allowance build in first quarter 2019 reflecting a higher probability of slightly less favorable economic conditions, compared with an allowance release for the same period last year, reflecting improvement in our outlook for 2017 hurricane-related losses.

Nonperforming assets increased $394 million, or 6%, from December 31, 2018 and represented 0.77% of total loans. Nonaccrual loans increased $409 million from December 31, 2018, driven in part by a borrower in the utility sector, as well as increases in oil and gas. Foreclosed assets declined $15 million from December 31, 2018.

69.     On July 16, 2019, Wells Fargo issued a release providing its results for the quarter ended June 30, 2019 ("2Q19"). The Company stated it had generated $6.2 billion in net income during the quarter on $21.6 billion of revenue. Defendant Shrewsberry was quoted in the release as stating: "Our credit quality remained solid with net charge-offs near historic lows." The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $512.2 billion and that the Company had only $165 million in net charge-offs in its commercial portfolio during the quarter, or just 0.13% of the average loan balance. The release stated that Wells Fargo's ACL stood at $10.6 billion by quarter end, or 1.12% of total loans.

70.     Also on July 16, 2019, Wells Fargo held an earnings call with analysts and investors to discuss its 2Q19 financial results led by defendants Parker and Shrewsberry. During his prepared remarks, defendant Shrewsberry stated: "We had a $150 million reserve release, primarily driven by strong overall credit portfolio performance . . . ." Later in the call, defendant Shrewsberry stated: "I think our credit risks, our market risks, et cetera, have been historically very strong and continue to be

today."    Regarding Wells Fargo's commercial real estate portfolio, defendant Shrewsberry stated in pertinent part as follows: "Commercial real estate loans increased $105 million from the first quarter, the second consecutive linked quarter increase, as growth in mortgage lending was partially offset by runoff of construction loans reflecting cyclicality of commercial real estate construction projects and our continued credit discipline."

71.    On August 2, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 2Q19, which was certified as to its accuracy by defendants Parker and Shrewsberry.    The 2Q19 Form 10-Q included the financial and operational results contained in the 2Q19 earnings release.    The 2Q19 Form-Q stated that "[s]olid credit quality continued in second quarter 2019, as our net charge-off rate remained low at 0.28% (annualized) of average total loans."    The 2Q19 Form 10-Q stated that Wells Fargo held $32.9 billion in CLOs for sale and an additional $57 million in CLOs held-to-maturity as of June 30, 2019.

72.    The 2Q19 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in second quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $653 million, or 0.28% (annualized) of average loans, in second quarter 2019, compared with $602 million a year ago (0.26%) (annualized). The increase in net charge-offs in second quarter 2019, compared with a year ago, was predominantly driven by higher losses in the commercial and industrial portfolio and the credit card portfolio, partially offset by declines in the automobile portfolio.

Our commercial portfolio net charge-offs were $165 million, or 13 basis points (annualized) of average commercial loans, in second quarter 2019, compared with net charge-offs of $67 million, or 5 basis points (annualized), a year ago . . . .

The allowance for credit losses as of June 30, 2019, decreased $507 million compared with a year ago and decreased $104 million from December 31, 2018. We had a $150 million release in the allowance for credit losses in both second quarter 2019 and 2018. The allowance coverage for total loans was 1.12% at June 30, 2019, compared with 1.18% a year ago and 1.12% at December 31, 2018. The allowance covered 4.0 times annualized second quarter net charge-offs, compared with 4.6 times a year ago. Future

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $503 million in second quarter 2019, up from $452 million a year ago.

Nonperforming assets decreased $1.0 billion, or 14%, from March 31, 2019, and $648 million, or 9%, from December 31, 2018, and represented 0.66% of total loans at June 30, 2019. Nonaccrual loans decreased $983 million from March 31, 2019, and $574 million from December 31, 2018, driven by a decline in consumer nonaccruals from the reclassification of $373 million in real estate 1-4 family first mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in second quarter 2019, as well as other broad-based improvement across several commercial industry categories. Foreclosed assets decreased $59 million from March 31, 2019, and $74 million from December 31, 2018.

73.     On October 15, 2019, Wells Fargo issued a release providing its results for the quarter ended September 30, 2019 ("3Q19").  The Company stated that it had generated $4.6 billion in net income during the quarter on $22 billion of revenue.  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $512.3 billion and that the Company had only $139 million in net charge-offs in its commercial portfolio during the quarter, or just 0.11% of the average loan balance.  The release stated that Wells Fargo's ACL stood at $10.6 billion by quarter end, or 1.11% of total loans.

74.     Also on October 15, 2019, Wells Fargo held an earnings call with analysts and investors to discuss its 3Q19 financial results led by defendants Parker and Shrewsberry.   Regarding the Company's commercial loan, CLO and commercial real estate loan portfolios, defendant Shrewsberry stated in pertinent part as follows:

Commercial loans were stable linked quarter as growth in C&I loans and lease financing was largely offset by declines in commercial real estate loans. C&I loans were up $2 billion, with broad-based corp growth in corporate and investment banking and the purchase of CLOs in loan form in the credit investment portfolio. These increases were partially offset by declines in commercial banking on lower government and institutional banking and middle-market lending and in commercial capital driven by seasonally lower commercial distribution finance dealer floor plan loans.

Commercial real estate loans declined $2.2 billion from the second quarter with declines in both commercial real estate mortgage and commercial real estate construction loans, reflecting increased market liquidity, higher refinancing activity and continued credit discipline.

75.    Later in his prepared remarks, defendant Shrewsberry stated: "We're generating growth in originations while maintaining our strong credit discipline with consistent loan-to-value, payment-to-income and FICO scores."    He continued in pertinent part as follows: "We closely monitor our commercial portfolio for signs of weakness, and credit quality indicators remain strong. Our internal credit grades are at their strongest levels in 2 years. And since third quarter of 2017, our criticized loan balances have declined 20% with broad-based improvement across all commercial asset classes."

76.    In response to an analyst's question, defendant Shrewsberry represented that Wells Fargo was exceedingly careful in issuing commercial real estate loans, stating: "[S]o we really have to pick our spots in order to maintain our risk/reward, credit and pricing and loan terms quality."

77.    On November 1, 2019, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 3Q19, which was certified as to its accuracy by Scharf and defendant Shrewsberry.  The 3Q19 Form 10-Q included the financial and operational results contained in the 3Q19 earnings release.  The 3Q19 Form-Q stated that "[s]olid credit quality continued in third quarter 2019, as our net charge-off rate remained low at 0.27% (annualized) of average total loans."  The 3Q19 Form 10-Q stated that Wells Fargo held $31.0 billion in CLOs for sale and an additional $49 million in CLOs held-to-maturity as of September 30, 2019.

78.    The 3Q19 Form 10-Q contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Solid overall credit results continued in third quarter 2019 as losses remained low and we continued to originate high quality loans, reflecting our long-term risk focus. Net charge-offs were $645 million, or 0.27% (annualized) of average loans, in third quarter 2019, compared with $680 million a year ago (0.29%) (annualized). The decrease in net charge-offs in third quarter 2019, compared with a year ago, was predominantly driven by lower losses in the commercial real estate, automobile, and real estate 1-4 family junior lien mortgage portfolios, partially offset by increases in the real estate 1-4 family first mortgage and credit card portfolios.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Our commercial portfolio net charge-offs were $139 million, or 11 basis points (annualized) of average commercial loans, in third quarter 2019, compared with net charge-offs of $152 million, or 12 basis points (annualized), a year ago . . . .

The allowance for credit losses as of September 30, 2019, decreased $343 million compared with a year ago and decreased $94 million from December 31, 2018. We had a $50 million build in the allowance for credit losses in third quarter 2019, compared with a $100 million release in the same period a year ago. The allowance coverage for total loans was 1.11% at September 30, 2019, compared with 1.16% a year ago and 1.12% at December 31, 2018. The allowance covered 4.1 times annualized net charge-offs in both third quarter 2019 and 2018. Future allowance levels will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for loan losses was $695 million in third quarter 2019, up from $580 million a year ago.

Nonperforming assets decreased $317 million, or 5%, from June 30, 2019, and $965 million, or 14%, from December 31, 2018, and represented 0.63% of total loans at September 30, 2019. Nonaccrual loans decreased $377 million from June 30, 2019, and $951 million from December 31, 2018, driven by improvement across several commercial and consumer loan categories along with a decrease in consumer nonaccruals from sales of residential real estate mortgage loans as well as the reclassification of $10 million and $387 million in real estate 1-4 family mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in the third quarter and first nine months of 2019, respectively. Foreclosed assets increased $60 million from June 30, 2019, and decreased $14 million from December 31, 2018.

79.    On January 14, 2020, Wells Fargo issued a release providing its results for FY19.  The Company stated it had generated $2.9 billion in net income during the fourth quarter on $19.9 billion of revenue.  The release further stated that the period-end loan balances for Wells Fargo's commercial loans totaled $515.7 billion and that the Company had only $203 million in net charge-offs in its commercial portfolio during the quarter, or just 0.16% of the average loan balance.  The release stated that Wells Fargo's ACL stood at $10.5 billion by quarter end, or 1.09% of total loans.

80.    Also on January 14, 2020, Wells Fargo held an earnings call with analysts and investors to discuss its FY19 financial results led by Scharf and defendant Shrewsberry.  In his prepared remarks, defendant Shrewsberry stated: "We continue to have strong credit results with 32 basis points of net charge-offs in the fourth quarter."  He continued: "Overall credit quality indicators in our commercial portfolio remain strong with our fourth quarter internal credit grades at their strongest levels in 2 years."

Later, in response to an analyst's question, defendant Shrewsberry stated that the Company's "total CLO exposure is about $38 billion," which he reassured investors was "an asset class that we feel comfortable with the risk/reward."

81.    On February 27, 2020, Wells Fargo filed with the SEC its annual report on Form 10-K for FY19, which was signed by Scharf and defendant Shrewsberry, who also certified its accuracy.  The FY19 Form 10-K incorporated the Company's 2019 Annual Report and included the financial and operational results contained in the FY19 earnings release.  The FY19 Form 10-K stated that "[s]olid credit quality continued in 2019, as our net charge-off rate remained low at 0.29% of average total loans."  The FY19 Form 10-K also stated that Wells Fargo held $29.7 billion in CLOs for sale as of December 31, 2019.

82.    The FY19 Form 10-K contained the following summary regarding the purported credit quality of Wells Fargo commercial loans:

**Credit Quality**

Credit quality remained solid in 2019, as losses remained low and we continued to originate high-quality loans, reflecting our longterm risk focus. Net charge-offs were $2.8 billion, or 0.29% of average loans, in 2019, flat compared with 2018.

Our commercial portfolio net charge-offs were $652 million, or 13 basis points of average commercial loans, in 2019, compared with $429 million, or 9 basis points, in 2018, predominantly driven by increased losses in our commercial and industrial loan portfolio. . . .

The allowance for credit losses of $10.5 billion at December 31, 2019, decreased $251 million from the prior year. The allowance coverage for total loans was 1.09% at December 31, 2019, compared with 1.12% at December 31, 2018. The allowance covered 3.8 times net charge-offs in 2019, compared with 3.9 in 2018. Future amounts of the allowance for credit losses will be based on a variety of factors, including loan growth, portfolio performance and general economic conditions. Our provision for credit losses in 2019 was $2.7 billion, compared with $1.7 billion in 2018. The provision for credit losses in both 2019 and 2018 reflected continuing solid underlying credit performance. The provision for credit losses in 2018 also reflected a higher level of credit quality improvement compared with 2019, as well as an improvement in the outlook associated with 2017 hurricane-related losses.

Nonperforming assets (NPAs) at December 31, 2019, were $5.6 billion, down $1.3 billion from December 31, 2018. Nonaccrual loans decreased $1.2 billion from December 31, 2018, driven by improvement across all consumer loan categories, including a decrease in consumer nonaccruals from sales of residential real estate mortgage loans as well as the reclassification of real estate 1-4 family mortgage nonaccrual loans to mortgage loans held for sale (MLHFS) in 2019. Foreclosed assets were down $148 million from December 31, 2018.

83.     The statements referenced in ¶¶ 38-82 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to Wells Fargo's business, operations and financial condition, which were known to or deliberately disregarded by defendants: (i) that Wells Fargo had systematically failed to follow appropriate underwriting standards and due diligence guidelines in issuing billions of dollars' worth of commercial loans, including by inflating the net income and future expected cash flows of its commercial clients to justify issuing excessive loan amounts; (ii) that a materially higher proportion of Wells Fargo's commercial loan customers were of poor credit quality and/or at a substantially higher risk of default than disclosed to investors; (iii) that Wells Fargo had failed to timely write down commercial loans, CLOs and CMBS on its books that had suffered impairments; (iv) that Wells Fargo had materially understated the reserves needed for expected credit losses in its commercial portfolios; (v) that Wells Fargo had systematically misrepresented the credit quality and likelihood of default of the loans it packaged and securitized into CLOs and CMBS, including by artificially inflating the net income and expected cash flows of its commercial clients in loan and securitization documentation; (vi) that the CLO and CMBS-related loans issued and investment securities held by Wells Fargo were of lower credit quality and worth far less than represented to investors; (vii) that as a result of (i)-(vi), above, Wells Fargo's Class Period statements regarding the credit quality of its commercial loans, its underwriting and due diligence practices, and the value of its CLO and CMBS books were materially false and misleading; and (viii) as a result of all the foregoing, Wells Fargo was exposed to severe undisclosed risks of financial,

reputational and legal harm, in particular in the event of significant and sustained stress in the commercial credit markets.

84.    In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the Company's quarterly and annual financial reports issued during the Class Period to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose the deficiencies in Wells Fargo's issuance and securitization of commercial loans and the actual credit quality of the Company's commercial credit portfolios, as well as the attendant risks these deficiencies entailed, as detailed herein, violated Item 303 because these activities represented trends and uncertainties known to defendants that were likely to (and did) have a material unfavorable impact on the Company's business and financial results.

## The Truth Begins to Emerge

85.    On April 14, 2020, Wells Fargo issued a release providing its results for the quarter ended March 31, 2020 ("1Q20").  The 1Q20 release revealed a stunning deterioration in the Company's credit portfolio, particularly with respect to its commercial loans.  Wells Fargo stated that it was taking a massive *$4 billion* provision expense to account for expected credit delinquencies, which included $940 million in net charge-offs on loans and debt securities and a $3.1 billion reserve build.  Total ACL at period-end increased 15% to $12.0 billion, despite a $1.3 billion decline as a result of an accounting change due to the adoption of the current expected credit loss, or "CECL," model.  Net charge-offs as a percentage of average loans in the commercial portfolio had more than doubled year over year to 0.25%.  Total credit losses were $909 million during the quarter, up $140 million compared to the prior quarter.  In addition, nonperforming assets had increased $759 million, or 13%, over the prior quarter, predominantly on higher commercial nonaccruals, while commercial nonaccrual loans increased by $621 million.

86.     Also on April 14, 2020, Wells Fargo held an earnings call with analysts and investors to discuss its 1Q20 financial results led by Scharf and defendant Shrewsberry.  In the accompanying slide deck, defendants stated that the largest component of Wells Fargo's C&I portfolio was its "Financials except banks" category at $126 billion, or 30% of total C&I loans outstanding.  During the call, defendant Shrewsberry stated that this bucket included loans to CLO credit managers and originators, who were expected to experience further "stress."

87.     The price of Wells Fargo stock plummeted on this news, falling 14% over three trading days to close at $26.89 per share by April 16, 2020, on abnormally high trading volume.

88.     On May 5, 2020, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 1Q20, which stated that the fair value of the Company's CLO investments held-for-sale had fallen to $26.9 billion by the quarter's end, a 9% decline from the end of FY19, and that Wells Fargo had suffered ***$1.7 billion*** in unrealized losses on its CLO investments during the quarter.

89.     The price of Wells Fargo stock fell further on this news, falling 6% over two trading days to close at $25.61 per share by May 6, 2020, on abnormally high trading volume.

90.     On June 10, 2020, defendant Shrewsberry presented at the Morgan Stanley Virtual US Financials Conference.  During the conference, defendant Shrewsberry revealed that Wells Fargo's second quarter reserve build would be even "bigger than the first quarter" as a result of continued deterioration in the Company's credit portfolio.

91.     On this news, the price of Wells Fargo stock fell 18% over two trading days to close at $26.79 per share by June 11, 2020, on abnormally high trading volume.

92.     On July 14, 2020, Wells Fargo issued a release providing its results for the quarter ended June 30, 2020 ("2Q20").  The 2Q20 release stated that Wells Fargo had suffered a ***$2.4 billion loss*** during the quarter, or ($0.66) per share, largely as a result of deterioration in its commercial credit portfolio.  Wells Fargo stated that it was taking a stunning $9.5 billion provision expense to account for

expected credit delinquencies – more than double the massive provision the Company had taken in 1Q20.  This provision expense included $1.1 billion in net charge-offs on loans and debt securities, mostly occurring in the Company's commercial loan portfolio, and an $8.4 billion increase in ACL. Total ACL increased to $20.4 billion by period-end, or 2.19% of total loans, nearly double Wells Fargo's ACL at the end of FY19.  Net charge-offs as a percentage of average loans in the commercial portfolio skyrocketed to 0.44%, compared to just 0.13% in the comparable prior-year period. Nonperforming assets similarly spiked 22% compared to 1Q20 to $7.8 billion, predominantly due to a $1.4 billion increase in commercial nonaccrual loans.

93.     Also on July 14, 2020, Wells Fargo held an earnings call with analysts and investors to discuss its 2Q20 financial results led by Scharf and defendant Shrewsberry.  In the accompanying slide deck, defendants stated that Wells Fargo had commercial criticized assets of $38.2 billion, up 53% sequentially, due to a $7.2 billion increase in criticized C&I loans and a $6.1 billion increase in criticized CRE loans.  In particular, nonaccruals in the financials except banks subcategory of C&I, which included loans to CLO providers, more than doubled to $219 million, while CRE loans in nonaccrual increased 30% sequentially to $1.3 billion.

94.     A July 14, 2020 analyst report by Piper Sandler illustrated market sentiment regarding the shocking revelations about the deterioration in Wells Fargo's credit portfolio, observing that the "*[e]normous provision drives [Wells Fargo's quarterly] loss to worse than even the most punitive estimates*."

95.     The price of Wells Fargo stock declined further on this news, falling 5% to $24.25 per share by market close on July 14, 2020, on abnormally high trading volume.

96.     On August 4, 2020, Wells Fargo filed with the SEC its quarterly report on Form 10-Q for 2Q20, which stated that the fair value of the Company's CLOs held-for-sale had further declined to

$25.7 billion by quarter's end and that the Company had suffered $728 million in unrealized losses during the quarter.

97.    On October 14, 2020, Wells Fargo issued a release providing its results for the quarter ended September 30, 2020 ("3Q20").  The 3Q20 release stated that Wells Fargo had recognized another provision expense of $769 million and that non-accrual loans had increased $2.5 billion, or 45%, to $8 billion during the quarter.  During the conference call to discuss the results, defendant Shrewsberry warned that further deterioration had largely been forestalled as a result of short-term customer accommodations, stating that "customer accommodations we provided since the start of the pandemic could delay the recognition of net charge-offs, delinquencies and nonaccrual status."  He continued: "[T]here is increased uncertainty in economic forecasts that vary widely, and future credit performance may deteriorate as stimulus effects that benefited recent credit performance come to an end."

98.    The price of Wells Fargo stock fell further on this news, declining 6% to $23.25 per share by market close on October 14, 2020, on abnormally high trading volume.

99.    As a result of defendants' wrongful acts and omissions, and the decline in the price of Wells Fargo securities detailed herein, Plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

100.    As alleged herein, Wells Fargo and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Wells Fargo, their control over and/or

receipt and/or modification of Wells Fargo's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Wells Fargo, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

101.    Wells Fargo's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. § 78u-5(b)(2)(A).

102.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Wells Fargo who knew that the forward-looking statement was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

103.    At all relevant times, the market for Wells Fargo securities was an efficient market for the following reasons, among others:

(a)    Wells Fargo stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      according to the Company's Form 10-K for the fiscal year ended December 31, 2019, Wells Fargo had more than 4 billion shares of common stock outstanding as of February 18, 2020;

(c)      as a regulated issuer, Wells Fargo filed periodic public reports with the SEC;

(d)      Wells Fargo regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)      unexpected material news about Wells Fargo was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

104.     As a result of the foregoing, the market for Wells Fargo securities promptly digested current information regarding Wells Fargo from publicly available sources and reflected such information in the price of Wells Fargo securities.  Under these circumstances, all purchasers of Wells Fargo securities during the Class Period suffered similar injury through their purchases of Wells Fargo securities at artificially inflated prices, and a presumption of reliance applies.

105.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Wells Fargo's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

1
2
3
4
5
6
7
8
9
10
11
12
13

## LOSS CAUSATION/ECONOMIC LOSS

106.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Wells Fargo securities and operated as a fraud or deceit on Class Period purchasers of Wells Fargo securities by misrepresenting the value of the Company's business and prospects by concealing the significant defects in its underwriting and due diligence practices and deficiencies in its commercial credit portfolio and related securitized assets.   As the defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the securities' price.   As a result of their purchases of Wells Fargo securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14
15
16
17
18
19
20
21

107.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Wells Fargo securities during the Class Period (the "Class").   Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

22
23
24
25
26
27

108.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wells Fargo securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Wells Fargo or

28

its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

109.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

110.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

111.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by defendants as alleged herein;

(b)    whether statements made by defendants misrepresented material facts about the business, operations and management of Wells Fargo; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

112.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

113.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

114.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Wells Fargo securities during the Class Period.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wells Fargo securities.  Plaintiff and the Class would not have purchased Wells Fargo securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against All Defendants)**

117.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

118.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Company stock, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  November 13, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Attorneys for Plaintiff***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS